United States District Court
Southern District of Texas
**ENTERED**
July 29, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| TODD ALAN FEEMSTER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 6:17-CV-39 |
| | § | |
| P. CHAPA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION
## TO GRANT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Todd Alan Feemster is a Texas inmate appearing *pro se* and *in forma pauperis*. He filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983, asserting claims under the Eighth Amendment, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A), and the Rehabilitation Act (RA), 29 U.S.C. § 794. Pending before the Court are the following: (1) a Motion for Summary Judgment filed by Defendant Dr. Christi Tupa (D.E. 84); and (2) a Motion for Summary Judgment filed by Defendants Texas Department of Criminal Justice (TDCJ), R. Beard, Jr., V. Maciel, T. Salles, and V. Tijerina (the "TDCJ Defendants") (D.E. 99).

For the reasons stated herein, it is respectfully recommended that the Court **GRANT** Defendant Tupa's summary judgment motion and the TDCJ Defendants' summary judgment motion.

## I.      JURISDICTION

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.  This case was referred to the undersigned United States Magistrate Judge for case management and to furnish a recommendation pursuant to 28 U.S.C. § 636.

## II.     PROCEDURAL BACKGROUND

Plaintiff is currently residing at the C.T. Terrell/Ramsey 3 Unit in Rosharon, Texas. The facts giving rise to Plaintiff's claims in this lawsuit occurred during Plaintiff's previous assignment to the Stevenson Unit in Cuero, Texas.  In his original complaint, Plaintiff named the following persons as defendants in their individual and official capacities: (1) P. Chapa, Region IV Assistant Director; (2) Warden R. Beard, Jr., Warden; (3) F. Merida, Assistant Warden; (4) E. Ruiz, Major; (5) P. Baros, Investigator; (6) V. Maciel, Unit Classification Committee (UCC) Program Supervisor; (7) T. Salles, Correctional Officer; (8) V. Tijerina, Correctional Officer; (9) D. Gloor, Senior Practice Manager; and (10) Dr. C. Tupa. (D.E. 1, pp. 3-7).

A *Spears*[1] hearing was conducted on November 9, 2017.  On December 18, 2017, the undersigned issued a Memorandum and Recommendation (December 18, 2017 M&R), recommending that: (1) Plaintiff's deliberate indifference claims to his health and safety be retained against: (a) Warden Beard, Program Supervisor Maciel, Officer Salles, and Officer Tijerina in their individual capacities; and (b) Warden Beard and Program Supervisor Maciel in their official capacities for injunctive relief; (2) Plaintiff's deliberate

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

indifference claim to his serious medical needs be retained against Dr. Tupa; (3) Plaintiff's ADA/RA claim be retained against the TDCJ; (4) Plaintiff's claims for money damages against all Defendants in their official capacities be dismissed as barred by the Eleventh Amendment; and (5) Plaintiff's claims against the remaining defendants be dismissed for failure to state a claim and/or as frivolous. (D.E. 23). Senior United States District Judge Hayden Head subsequently overruled Plaintiff's objections and adopted the undersigned's December 18, 2017 M&R. (D.E. 28, 31).

The undersigned ordered service on several defendants. (D.E. 24). On February 5, 2018, Dr. Tupa filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.E. 36). On June 12, 2018, the undersigned issued a Memorandum and Recommendation (June 12, 2018 M&R), recommending that Dr. Tupa's motion to dismiss be denied. (D.E. 61). The June 12, 2018 M&R remains pending before the district judge.

On October 16, 2018, Dr. Tupa filed her Motion for Summary Judgment, to which Plaintiff has filed a response. (D.E. 84, 91). On December 20, 2018, the TDCJ Defendants filed their Motion for Summary Judgment, to which Plaintiff also has filed a response. (D.E. 99, 112).[2]

---

[2] In his response to the TDCJ's summary judgment motion, Plaintiff expresses his dissatisfaction with several rulings in this case as well as his difficulties in litigating this case. (D.E. 112, p. 2-18). The record reflects, however, that Plaintiff has successfully responded to the summary judgment motions, which are the only matters pending before the undersigned. Plaintiff further asserts a denial-of-access-to-courts claim which is based on events that occurred after the filing of this case. Plaintiff may not raise such a claim in connection with this case but may do so in a separate civil rights complaint filed in the appropriate district court. Plaintiff otherwise has presented nothing in his various objections and complaints which would entitle him to any relief.

### III.    SUMMARY JUDGMENT EVIDENCE

Dr. Tupa offers the following evidence in support of her summary judgment motion:

Exh. A:    Affidavit of Dr. Steven Bowers with attached exhibits (D.E. 84-2).

Exh. B:    Plaintiff's relevant UTMB medical records (D.E. 84-3).

Exh. C:    Plaintiff's relevant TDCJ medical records (D.E. 84-4).

Exh. D:    Plaintiff's Relevant classification records (D.E. 84-5).

Exh. E:    Plaintiff's relevant grievance records (D.E. 84-6).

The TDCJ Defendants offer the following evidence in support of their summary judgment motion:

Exh. A:    TDCJ Grievance No. 2016146740 (D.E 99-1).

Exh. B:    TDCJ Grievance No. 2017108972 (D.E. 99-2).

Exh. C:    Affidavit of Valerie Maciel with attachments (D.E. 99-3).

Plaintiff, in turn, has attached the following evidence to his response to Dr. Tupa's summary judgment motion: (1) Plaintiff's Declaration in Support of Answer (D.E. 91-1); and (2) Plaintiff's Affidavit (D.E. 91-2).    Plaintiff has not attached any evidence to his response to the TDCJ Defendants' summary judgment motion.

Plaintiff's verified complaint and testimony at the *Spears* hearing, however, may serve as competent summary judgment evidence. *See Garrett v. Davis*, No. 2:14-CV-70, 2017 WL 1044969, at *3 (S.D. Tex. Mar. 20, 2017).    Like other parts of the record,

Plaintiff's verified complaint and *Spears*-hearing testimony must satisfy Federal Rule of Civil Procedure 56(c) in order to be considered at summary judgment. *See Mengele v. AT&T Servs. Inc.*, No. 3:15-cv-3934, 2017 WL 3835871, at *3 (N.D. Tex. Aug. 9, 2017) ("[T]he verified complaint and sworn interrogatory answers of the *pro se* litigant can be considered as summary judgment evidence *to the extent that such pleadings comport with the requirements of current Rule 56(c)*.") (emphasis added) (citations omitted). The undersigned, therefore, will not consider parts of Plaintiff's verified complaint or *Spears*-hearing testimony that are not made on personal knowledge or that would be inadmissible in evidence. *See* Fed. R. Civ. P. 56(c)(4).

Accordingly, the competent summary judgment evidence establishes the following:

### A.    Plaintiff's Verified Complaint and *Spears* Hearing Testimony

Before his incarceration, Plaintiff was a United States Marine for fifteen years and received an honorable discharge in 1995. Plaintiff was initially assigned to the Stevenson Unit on November 15, 2010. Plaintiff has a variety of health issues. Plaintiff testified at the *Spears* hearing that he has not received any kind of disability payments for any of his health issues. In 2013, Plaintiff experienced dental problems in the form of an abscess in two molars. Plaintiff's dental issues led to nerve damage as well as difficulties in speaking. Plaintiff's nerve damage remains to this day.

Plaintiff also suffers from numbness to both of his hands, elbows, and shoulders when performing repetitive tasks. Plaintiff's issues with numbness developed after Plaintiff was incarcerated. Plaintiff received a diagnosis from the medical department of

repetitive trauma. Plaintiff further describes health issues with his feet, such as ingrown toenails, which resulted from wearing steel toe boots. Plaintiff's issues with his feet also have developed since his incarceration. Lastly, Plaintiff suffers from severe abdominal problems, in which he has pain, difficulty in crouching, and difficulty in using the bathroom. According to Plaintiff, he has been diagnosed by the medical department as suffering from two types of hernias.

From 2010 through October of 2012, Plaintiff was assigned to work in the Stevenson Unit's Field (Hoe) Squad. Sometime in 2012, Plaintiff received a medical diagnosis that led to the following restrictions in his TDCJ Health Summary for Classification (HSM-18): no work requiring repetitive use of hands and no work requiring steel toe or safety boots. These job restrictions led to his reassignment on October 3, 2012 to the Garden/Medical Squad. As a member of the Garden/Medical Squad, Plaintiff was charged with watering the crops in both the field and the decorative plants around the unit.

On May 16, 2016, Warden Beard directed UCC Program Supervisor Maciel to change Plaintiff's job assignment from Garden/Medical Squad to kitchen detail. Warden Beard made this change to Plaintiff's job assignment. No explanation was provided to Plaintiff as to why his job assignment was changed. Plaintiff states that this job reassignment was medically inappropriate in that it required the highly repetitive use of his hands.

Plaintiff worked in the kitchen for two months. Plaintiff alleges his reassignment to the kitchen caused him harm in that he "began to experience severe pain, cramping,

numbness and loss or limited use of/in hands, wrists, elbows and knees." (D.E. 5, p. 4). Plaintiff further had difficulty in getting out of his top bunk assignment, sleeping, and performing daily tasks that require a high level of manual dexterity. Plaintiff was prescribed Ibuprofen for pain relief. Plaintiff alleges Dr. Tupa told Plaintiff that he should talk to his supervisor about his medical problems. Dr. Tupa also told Plaintiff that there was nothing wrong with him.

On May 25, 2016, Plaintiff's job assignment was changed from kitchen to janitor at the direction of former Food Service Kitchen Captain Oliver and pursuant to the order of UCC Program Supervisor Maciel. Plaintiff further believes this job reassignment was medically inappropriate. He continued to experience medical problems, including issues associated with a hernia. According to Plaintiff, Dr. Tupa repeatedly told Plaintiff that there was nothing wrong with him and provided him only with aspirin.

As a janitor, Plaintiff was assigned to work in offender living areas and was directly supervised by correctional officers assigned to the building on that day. Plaintiff was required to sweep, dust, mop, bend, and move heavy water buckets, which placed him in constant pain and violates his work restrictions. Plaintiff alleges Officer Salles disregarded Plaintiff's safety by requiring him to fill, move, lift, and place ten-gallon water containers, weighing as much as 84 pounds, with no brace, belt, dolly, or cart. Plaintiff further complains he was forced to perform this strenuous labor on slippery floors and in extremely hot conditions. Plaintiff alleges Officers Salles and Tijerina each forced Plaintiff to engage in physical labor after Plaintiff identified to them his medical

work restrictions. Plaintiff further alleges Officer Salles often denied Plaintiff permission to take a shower despite letting all other SSI janitors shower.

Plaintiff's tasks as a janitor caused him to suffer severe pain and cramping in his hands, wrists, elbows, right shoulder, arms, back, and knees. Plaintiff further experienced abdominal pain.  On March 21, 2017, Plaintiff submitted an I-60 requesting a job change commensurate with his medical restrictions.   Program Supervisor Maciel denied the request, stating that Plaintiff was appropriately assigned.  Plaintiff submitted additional sick call requests, and  received more Ibuprofen.  When Plaintiff questioned the choice of medical treatment, his diagnostic interviews were terminated.

Due to Officer Salles's alleged continued mistreatment, Plaintiff filed a grievance on June 12, 2017.  As of the date of the *Spears* hearing when Plaintiff was housed at the Stevenson Unit, Plaintiff's job responsibility was officially listed as "janitor" or "SSI." According to Plaintiff, Defendants' injurious actions caused his hernia condition, and his life was adversely affected by pain, cramps, and difficulty in performing many basic life activities.

### B.     Dr. Tupa's Summary Judgment Evidence

In   May   2016,   after   Plaintiff's   job   assignment   was   changed   from   the Garden/Medical Squad to kitchen detail, Plaintiff submitted a sick call request.  (D.E. 84-4, p. 2).  In response to the sick call request, Dr. Tupa examined Plaintiff on May 18, 2016.  (D.E. 84-4, pp. 4-5).  A chart review revealed that Plaintiff had the following work restrictions at that time: "no repetitive use of hands" and "no work requiring safety boots."  (D.E. 84-2, p. 2; D.E. 84-4, p. 4).        Plaintiff complained to Dr. Tupa of right

elbow pain with limited range of motion (ROM) and informed him that his job assignment had been changed to work in the kitchen.  (D.E. 84-4, p. 4).  Dr. Tupa examined Plaintiff, finding he had full ROM in his right elbow with no swelling or discoloration.  (D.E. 84-4, p. 4).  Dr. Tupa prescribed Plaintiff 800 mg of Ibuprofen to be taken twice daily for 90 days.  (D.E. 84-4, p. 4).  He further determined that no further work restrictions were indicated.  (D.E. 84-4, p. 4).  Dr. Tupa noted that Plaintiff became argumentative saying that he would get work restrictions one way or another.  (D.E. 84-4, p. 4).

On May 24, 2016, Plaintiff saw Dr. Tupa to discuss his work restrictions.  (D.E. 84-4, pp. 6-7).  Plaintiff complained to Dr. Tupa that, upon working in the kitchen, he began to experience the following issues: (1) numbness and tingling in his hands; (2) his hands and wrists were sore; (3) his hands had little strength; (4) he had constant pain in elbow; (5) he experienced prostate/bladder pain; (6) he developed rashes on his legs, hand , and wrists; (7) he developed open sores on his foot; (8) he had difficulty urinating; and (9) he felt a worsening of his feet, knees, blood levels, and thyroid.  (D.E. 84-4, p. 6).  Plaintiff further complained that he did not have ready access to the bathroom when he worked in the kitchen.  (D.E. 84-4, p. 6).

Dr. Tupa examined Plaintiff and noted that Plaintiff had full ROM in both elbows with no swelling or discoloration and that Plaintiff's right foot and ankle had two abrasions with scabbing.  (D.E. 84-4, p. 6).  As a result of her examination, Dr. Tupa updated Plaintiff's medical restrictions to reflect a permanent restriction for lighter and slower activity due to one or more medical conditions or deficits that require significant

activity limitations or accommodations.  (D.E. 84-4, pp. 6-7).  Dr. Tupa further evaluated

Plaintiff's elbow pain complaint and ordered x-rays for Plaintiff's right elbow.  (D.E. 84-

4, p. 8). Dr. Tupa prescribed 800 mg of Ibuprofen and Tylenol for pain and gave Plaintiff

a triple antibiotic and Band-aids for his foot abrasions.  (D.E. 84-4, p. 7).  Dr. Tupa

advised Plaintiff to take  up the issue of the restroom with security.  (D.E. 84-4, p. 7).

Plaintiff again became argumentative, and the appointment was terminated.  (D.E. 84-4,

p. 7).  Lastly, Dr. Tupa advised Plaintiff that he may resubmit a sick call request as

needed.  (D.E. 84-4, p. 7).

On June 6, 2016, Dr. Tupa saw Plaintiff for complaints of right elbow and left

knee pain as well as a lower leg rash.  (D.E. 84-4, pp. 9-10).  Dr. Tupa examined Plaintiff

and found that he had full ROM in both elbows with no swelling or discoloration, that his

left knee had full ROM with no crepitis or swelling, and that both of his lower legs had

small rash and papules.  (D.E. 84-4, p. 9).  Dr. Tupa reviewed Plaintiff's x-rays and noted

they were normal.  (D.E. 84-4, pp. 9-10).  Dr. Tupa prescribed an ointment for Plaintiff's

rash.  (D.E. 84-4, p. 10).  Dr. Tupa further instructed Plaintiff: (1) to continue taking

Ibuprofen and Tylenol for pain; and (2) to help his elbow pain through certain exercises.

(D.E. 84-4, p. 10). Lastly, Dr. Tupa ordered x-rays of Plaintiff's left knee to rule out

trauma.  (D.E. 84-4, p. 10).

On June 9, 2016, the x-rays taken of Plaintiff's left knee showed that a fabella[3]

was present, that there were no acute fractures or discoloration, and that minimal

degenerative changes were present.  (D.E. 84-4, p. 11).  On July 14, 2016, Dr. Tupa

---

[3]  A fabella is a small bony shadow behind the knee joint.

reviewed Plaintiff's medical restrictions and determined they were medically appropriate with no changes needed.  (D.E. 84-4, p. 12).

Dr. Tupa next saw Plaintiff on October 24, 2016.  (D.E. 84-4, p. 13).  Plaintiff complained at that appointment about the footwear for his job and sought restriction of "no wet surfaces." (D.E. 84-4, p. 13).  Dr. Tupa noted that Plaintiff walked, sat, and rose from his chair without difficulty.  (D.E. 84-4, p. 13).  Dr. Tupa nevertheless observed a 10-centimeter pink spot on the top of Plaintiff's right foot which Plaintiff stated was a fungus he contracted in the Philippines.  (D.E. 84-4, p. 13).  Dr. Tupa determined that Plaintiff had a condition commonly known as athlete's foot and instructed Plaintiff to continue using the ointment previously prescribed.  (D.E. 84-4, p. 13).  Dr. Tupa further determined there was no medical indication for medical boots or for a "no wet surfaces" restriction.  (D.E. 84-4, p. 13).  Nevertheless, Dr. Tupa advised Plaintiff to discuss footwear needs with security.  (D.E. 84-4, p. 13).  Plaintiff was again argumentative with Dr. Tupa.  (D.E. 84-4, p. 13).

On December 15, 2016, Plaintiff saw Dr. Tupa again and complained of right elbow pain when carrying anything.  (D.E. 84-4, p. 15).  Dr. Tupa examined Plaintiff, noted Plaintiff had full ROM with no swelling or discoloration, and instructed Plaintiff to continue taking Ibuprofen. (D.E. 84-4, pp. 15-16).  Dr. Tupa further examined Plaintiff regarding his external hemorrhoid and prescribed various medications and creams for this condition.  (D.E. 84-4, pp. 15-16).

On March 17,2017, Dr. Tupa saw Plaintiff for complaints of: (1) an infection on both feet; (2) pain in wrists, elbow back and knees; and (3) ulcers in his mouth.  (D.E. 84-

4, pp. 17-19).  Dr. Tupa conducted a chart review which included review of Plaintiff's elbow and knee x-rays.  (D.E. 84-4, p. 18).  Dr. Tupa observed that Plaintiff could walk, sit, and rise from a chair without difficulty.  (D.E. 84-4, p. 18).  Dr. Tupa noted that Plaintiff had two ulcers under the right side of his tongue, that he could open and close his hands without difficulty, that his elbows had full ROM with no swelling or discoloration, and that his left foot had healing athlete's foot.  (D.E. 84-4, p. 18).  Dr. Tupa prescribed Meloxican for pain as well as additional medications to treat the athlete's foot.  (D.E. 84-4, p. 19).

In April 2017, Plaintiff sought medical treatment for bowel irritation and abdominal discomfort.  (D.E. 84-4, pp. 20-21).  Dr. Tupa and Nurse Practitioner Samantha Heibel signed off on the clinical notes dated April 26, 2017.  (D.E. 84-4, p. 21).  Plaintiff was diagnosed with a bilateral inguinal hernia and constipation.  (D.E. 84-4, p. 20).  Plaintiff was prescribed with fiber laxative tablets and castor oil to help with the constipation.  (D.E. 84-4, p. 21).  An additional medical restriction of "no lifting over 20 pounds" was given to Plaintiff, and he was instructed to avoid straining with bowel movements, to avoid heavy lifting, to increase fluid intake, and to increase fiber intake. (D.E. 84-4, pp. 20, 22).

On May 22, 2017, Dr. Tupa saw Plaintiff for complaints of infections to his feet and pain in his abdomen.  (D.E. 84-4, pp. 23-24).  Plaintiff described his feet as "tingling like sticklers."  (D.E. 84-4, p. 23).  Dr. Tupa noted that Plaintiff had a small reducible umbilical hernia, bilateral groin with unappreciable hernias, and popular rash on top of feet.  (D.E. 84-4, pp. 23-24).  Dr. Tupa recommended that Plaintiff see a specialist for his

hernia at the Galveston Hospital, but Plaintiff refused.  (D.E. 84-4, p. 24).  Dr. Tupa directed Plaintiff to continue using Meloxicam as directed as to use a topical cream for his rash.  (D.E. 84-4, p. 24).

On June 14, 2017, Plaintiff sought medical treatment for his complaints of pain in both wrists and abdomen, painful hemorrhoids, and concerns over applying topical medication while working.  (D.E. 84-4, p. 25).  Dr. Tupa observed that Plaintiff was able to sit and rise without difficulty, his abdomen was soft, distended, nontender to palpation, and had a positive bowel sounds in all four quadrants.  (D.E. 84-4, p. 25).  Dr. Tupa noted that Plaintiff had small non-protruding hernias on his bilateral inguinal side, that Plaintiff's wrists were not swollen, and that Plaintiff could move both his wrists with full ROM in his shoulders.  (D.E. 84-4, p. 25).

Dr. Tupa developed the following comprehensive plan of care for Plaintiff: (1) increasing Meloxicam from 7.5 mg once a day to twice daily; (2) ordering right wrist and abdominal x-rays to assess Plaintiff's complaints of pain; (3) ordering lab work to rule out infection or other causes of abdominal pain; and (4) renewing his hemorrhoid cream as requested.  (D.E. 84-4, p. 26).   Lastly, Dr. Tupa found no medical indication for further medical restrictions and informed Plaintiff that special shower passes for showering at work were not issued.  (D.E. 84-4, p. 26).

On June 16, 2017, Plaintiff had wrist and abdominal x-rays taken.  (D.E. 84-4, pp. 28-30).  The abdominal x-rays were negative for any significant findings, while the right wrist x-rays indicated mild osteoarthrosis.  (D.E. 84-4, pp. 28-30).

### C.    The TDCJ Defendants' Summary Judgment Evidence

#### (1) Grievances

On May 22, 2016, Plaintiff submitted a Step 1 grievance (Grievance No. 2016146740), described as a "medical grievance."   (D.E. 99-1, pp. 4-5).   Plaintiff complained about being reassigned from the Garden/Medical Squad to the kitchen.  (D.E. 99-1, p. 4).   He asserted that the reassignment occurred due to Dr. Tupa's failure to address his new medical problem and place new restrictions on him so that he would not have to work in the kitchen and be reassigned to the Garden/Medical Squad.  (D.E. 99-1, p. 4).   Plaintiff reported that he was suffering from various medical issues since his reassignment.  (D.E. 99-1, p. 4).

This grievance was denied based on the following reasons: (1) Plaintiff was seen for his medical complaints on May 21 and 24, 2016; (2) Plaintiff's PULHES (Physical capacity, Upper extremities, Lower extremities, Hearing, Eyes, Psychiatric) was updated; (3) the medical department had assigned all of the necessary restrictions; and (4) the assignment of jobs fell under the jurisdiction of classification.  (D.E. 99-1, p. 5).

In his Step 2 Grievance, Plaintiff stated that Dr. Tupa was responsible for the approval of Plaintiff's job assignment.  (D.E. 99-1, p. 2).  Plaintiff's Step 2 grievance, dated July 7, 2016, was reviewed and rejected for the same reasons set forth in the response to the Step 1 Grievance. (D.E. 99-1, pp. 2-3).

On March 22, 2017, Plaintiff submitted a Step 1 grievance (Grievance No. 2017108972), requesting reasonable accommodations for his work restrictions in accordance with the ADA/RA.  (D.E. 99-2, pp. 4-5).  Plaintiff indicated that his grievance

was filed against "[t]he Stevenson Unit TDCJ."  (D.E. 99-2, p. 4).  Plaintiff's Step 1 grievance was denied on the basis that Plaintiff was appropriately assigned based on his work restrictions and that Plaintiff needed to contact medical for updated restrictions. (D.E. 99-2, p. 5).

In his Step 2 grievance, dated April 5, 2017, Plaintiff complained that the grievance investigation into his Step 1 complaint failed to address his ADA/RA claim. (D.E. 99-2, p. 2).  Plaintiff further stated that his claim was against the TDCJ.  (D.E. 99-2, p. 2).  In denying Plaintiff's Step 2 grievance, the reviewing officer determined that Plaintiff: (1) had one additional restriction not to lift weights greater than 20 pounds; and (2) had demonstrated in his medical evaluation on March 17, 2017, he had full range of motion in his elbows and could open and close his hands without difficulty. (D.E. 99-2, p. 3).

### (2)   *Affidavit of Defendant Valerie Maciel*

Program Supervisor Maciel stated that, as her official role as Classifications Coordinator at the Stevenson Unit, she was familiar with TDCJ work assignment policies and has reviewed Plaintiff's classification file, including information related to his Health Summary for Classification (HSM) records.  (D.E. 99-3, pp. 2-3).  Citing TDCJ's Correctional Managed Health Care Policy A08-.04 (CMHC Policy A-08.04), Program Supervisor Maciel testified that "all offenders are assessed, classified, and assigned according to their medical and health limitations[,]" that qualified healthcare personal "will assign each offender appropriate restrictions related to (1) facility assignment, (2) housing, (3) physical activities and work, (4) disciplinary process, (5) individual

treatment plan, and (6) transportation." (D.E. 99-3, p. 3). The policy further provided that all work restrictions are indicated on the prisoner's HSM-18. (D.E. 99-3, p. 3).

Under CMHC Policy A-08.04, while medical providers determine whether any work restrictions are appropriate, the Uniform Classification Committee (UCC) makes offender job assignments. (D.E. 99-3, pp. 3-4). The UCC, of which Program Supervisor Maciel is a member, must ensure that all job assignments comply with any medical restrictions on work identified by an inmate's HSM-18. (D.E. 99-3, p. 4).

With regard to Plaintiff's job assignment, Program Supervisor Maciel states as follows: (1) prior to May 16, 2016, Plaintiff was assigned to the Garden Medical Squad, which are positions typically "held by offenders who are unable to be assigned to other roles due to profound disability or complicated work restrictions"; (2) because Plaintiff's work restrictions did not require him to stay on the Garden Medical Squad, he was reassigned in May 16, 2016, to kitchen duty; (3) Program Manager, along with Unit Administration reviewed Plaintiff's classification records and determined that the new assignment was appropriate; (4) this kitchen assignment was consistent with Plaintiff's restrictions as it did not require special footwear or the repetitive use of hands; (5) on May 23, 2016, the Kitchen Captain tried Plaintiff at both Counter Helper and the General Kitchen; (6) on May 24, 2016, after Plaintiff had filed an informal and formal grievance, Plaintiff was seen by Dr. Tupa; (7) while there were no changes in his work restrictions, the UCC reassigned Plaintiff to the job of janitor on May 25, 2016; (8) on April 26, 2017, Plaintiff was diagnosed with hernia, and his Health Summary Record was updated with a work restriction prohibiting tasks that require lifting over twenty pounds; (9) the UCC

continued Plaintiff's assignment as a janitor with the added work restriction involving lifting over twenty pounds; and (10) Plaintiff continued his job as a janitor until he was transferred from the unit on or around December 1, 2017. (D.E. 99-1, pp. 4-6).

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits

and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.   *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.   Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248.   "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."   *Caboni*, 278 F.3d at 451.   "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."   *Anderson*, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.   *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).   When a government official has pled the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law.   *Id.* Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct.   *Bazan v. Hidalgo County*, 46 F.3d 481, 490 (5th Cir. 2001).

V.     DISCUSSION

   A.      Dr. Tupa's Summary Judgment Motion

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted). A prison official violates this duty when by act or omission he is deliberately indifferent to prison conditions which pose a substantial risk of serious harm. *Id.* at 834.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege that prison officials acted with deliberate indifference to serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Deliberate indifference requires that prison officials both be aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. *Farmer*, 511 U.S. at 837.

In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation omitted). A "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] *results in*

substantial harm." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (emphasis in original).

"Deliberate indifference is an "extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). Furthermore, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances." *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012).

Dr. Tupa contends in her dispositive motion that "[t]he competent summary judgment evidence fails to show how [she] was deliberately indifferent to [Plaintiff's] needs." (D.E. 84, p. 11). She further contends that Plaintiff's disagreement with the medical care provided does not amount to deliberate indifference. (D.E. 84, p. 12).

Plaintiff responds Dr. Tupa was aware of Plaintiff's serious medical needs as well as the job responsibilities associated with work in both the kitchen and as a janitor during the course of her treatment of Plaintiff. (D.E. 91, pp. 3-4). Plaintiff contends that Dr. Tupa acted with deliberate indifference to his serious medical needs by providing him with inadequate care throughout the course of her treatment of Plaintiff. (D.E. 91, p. 4).

In his verified complaint and testimony at the *Spears* hearing, Plaintiff stated that Dr. Tupa ignored his medical issues when failing to assign him appropriate medical restrictions, only prescribed aspirin and Ibuprofen for pain, and told Plaintiff there was

nothing wrong with him.  The objective medical evidence shows, however, that from May 18, 2016 through June 9, 2016: (1) Dr. Tupa examined Plaintiff on several occasions for his complaints of elbow and knee pains, abrasions, and a lower leg rash; (2) Dr. Tupa found on each occasion that Plaintiff had full ROM in his elbows with no swelling or discoloration; (3) Plaintiff's left knee had full ROM with no swelling; (3) Dr. Tupa prescribed Ibuprofen and Tylenol for pain, a triple antibiotic and Band-aids for his foot abrasions, and ointment for his rash; (4) as a result of an examination on May 24, 2016, Dr. Tupa updated   Plaintiff's PULHES medical restrictions to reflect a permanent restriction for lighter and slower activity due to one or more medical conditions or deficits that require significant activity limitations or accommodations; and (5) ordered x-rays on Plaintiff's left knee which revealed that fabella was present, that there were no acute fractures or discoloration, and that minimal degenerative changes were present. (D.E. 84-2, p. 2; D.E. 84-4, pp. 4-12).

The objective medical evidence further shows that, from October 24, 2016 through June 16, 2017, Dr. Tupa examined Plaintiff on several occasions and provided the following care: (1) on October 24, 2016, Dr. Tupa determined that Plaintiff had contracted athlete's foot and instructed Plaintiff to use a previously-prescribed ointment; (2) on December 15, 2016, Dr. Tupa evaluated Plaintiff's right elbow and external hemorrhoid condition, prescribing medications and creams; (3) on March 17, 2017, Dr. Tupa evaluated Plaintiff's various complaints regarding his feet, wrists, elbows, back, knees, and mouth; (4) Dr. Tupa prescribed Plaintiff Meloxican for pain as well as additional medications to treat Plaintiff's athlete's foot; (5) on May 22, 2017, upon

evaluation of Plaintiff's complaint of infections to his feet and pain in the abdomen, Dr. Tupa recommended that Plaintiff see a specialist for a hernia, prescribed Meloxicam for pain, and directed Plaintiff to use a topical cream for his rash; and (6) on June 14, 2017, Dr. Tupa developed a comprehensive plan of case for treatment of Plaintiff's wrists, abdomen, and hemorrhoids, which included medications and the ordering of x-rays and lab work. (D.E. 84-4, pp. 13-30).

Overall, the competent summary judgment evidence shows that Dr. Tupa provided Plaintiff with extensive medical care and treatment following his work reassignment in May 2016 from the Garden/Medical Squad to kitchen detail. No evidence has been presented to suggest that Dr. Tupa ignored Plaintiff's complaints, failed to treat Plaintiff's serious medical needs, or was deliberately indifferent to his health. Plaintiff's complaints regarding the medical treatment received by Dr. Tupa and his failure to provide certain medical restrictions amount to his disagreement over the course of treatment he has received. *See Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim.") (citations omitted). Plaintiff's disagreement with the medical care afforded to him by Dr. Tupa, therefore, is insufficient to state a § 1983 claim. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Accordingly, even when taking as true the evidence in a light most favorable to Plaintiff, he has submitted no summary judgment evidence which raises a

genuine issue of fact as to whether Dr. Tupa acted with deliberate indifference to his serious medical needs.

Dr. Tupa contends she is entitled to qualified immunity in connection with Plaintiff's claims against her in her individual capacity. The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). "To discharge this burden, the plaintiff must satisfy a two-prong test. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). First, he must claim that the defendant committed a constitutional violation under current law. *Id.* Second, he must claim that the defendant's action was objectively reasonable in light of the law that was clearly established at the time of the complained-of actions. *Id.*

It is often but not always appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation has occurred. *See Pearson*, 555 U.S. at 236. In this case, because Plaintiff has failed to establish an Eighth Amendment claim against Dr. Tupa, it is not necessary to examine whether their actions were objectively reasonable. Accordingly, it is respectfully recommended that Dr. Tupa is

entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claim asserted against her in her individual capacity.

### B.    TDCJ's Summary Judgment Motion

### (1)   *Exhaustion*

In their summary judgment motion, Defendants Beard, Maciel, Salles, and Tijerina seek dismissal of Plaintiff's deliberate indifference claims against them in their individual capacity for failure to exhaust his administrative remedies.   (D.E. 99, pp. 2-4).   The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002).  Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process.  *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).   A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).  Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints.  *Jones v. Bock*, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam). Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004). The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has fifteen days to appeal by filing a Step 2 grievance, which is handled at the state level. *Id.* Both steps must be completed in order to file suit in federal court. *Id* at 515-16 ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted."). *See also Dillon v. Rogers,* 596 F.3d 260, 268 (5th Cir. 2010) ("under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly.").

Because exhaustion is an affirmative defense, Defendants Beard, Maciel, Salles, and Tijerina have the burden to demonstrate that Plaintiff failed to exhaust available administrative remedies.'" *Cowart v. Erwin*, 837 F.3d 444, 451 (5th Cir. 2016) (quoting *Dillon*, 596 F.3d at 266). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon*, 596 F.3d at 266. "[W]hile it is a question of law whether administrative remedies qualify as being "available" under 42 U.S.C. § 1997e(a)," in a given case and under a given set of circumstances "availability may sometimes turn on questions of fact." *Id*.

With respect to Grievance No. 201614670, Defendants Beard, Maciel, Salles, and Tijerina contend that it is a "medical grievance" which does not identify any of the

individual TDCJ defendants in either the Step 1 or Step 2 grievance.  (D.E. 99, p. 3).
They further contend that Plaintiff exclusively complained about the actions of medical
personnel from whom he exclusively sought relief.  (D.E. 99, p. 3).  With respect to
Grievance No. 2017108972, Defendants Beard, Maciel, Salles, and Tijerina contend that
it exclusively concerns Plaintiff's ADA/RA claim against the TDCJ.  (D.E. 99, p. 4).

Plaintiff contends that he is not required to state any legal arguments or reasoning
in a grievance and that his grievances contain sufficient detail to alert prison officials
about Plaintiff's deliberate indifference claims against them.  (D.E. 112, p. 25).  Plaintiff
asks the Court to recognize his efforts in exhausting his administrative remedies.  (D.E.
112, p. 25).

In *Johnson*, the Fifth Circuit discussed how much detail is required in a grievance
for purposes of effectively exhausting administrative remedies.  The Fifth Circuit noted
that one of the purposes of the exhaustion requirement is to give officials "time and
opportunity to address complaints internally."   *Johnson*, 385 F.3d at 517 (citations
omitted).   The *Johnson* court further acknowledged that "the primary purpose of a
grievance is to alert prison officials to a problem, not to provide personal notice to a
particular official that he may be sued; the grievance is not a summons and complaint that
initiates adversarial litigation."  *Id.* at 522.  *See also Jones*, 549 U.S. at 219 (concluding
that exhaustion is not *per se* inadequate simply because an individual later sued was not
named in grievances).

In other words, a grievance "should be considered sufficient to the extent that the
grievance gives officials a fair opportunity to address the problem that will later form the

basis of the lawsuit." *Id.* Further, the nature of the complaint will influence how much detail is necessary. *Id.* For example, a complaint about a correctional officer would identify a specific person, whereas a complaint about a prison condition, such as vermin in a cell or that commissary costs are too high, might not identify any individual. *Id.*

The Fifth Circuit in *Johnson* further explained that, with regard to complaints about prison officials acting improperly, an administrator responding to a grievance ordinarily would want to know the identity of the prison official involved. *See Johnson*, 385 F.3d at 517. The *Johnson* court recognized, however, "that a grievance can sufficiently identify a person even if does not provide an actual name." *Id.* at 523.

The undersigned finds that Plaintiff's grievances (Grievance Nos. 201614670 and 2017108972) failed to provide reviewing officials with proper notice to address any of Plaintiff's deliberate indifference claims against Defendants Beard, Maciel, Salles, and Tijerina, who are all mon-medical personnel. With respect to Plaintiff's Step 1 and Step 2 grievances in Grievance No. 201614670, Plaintiff expressly limited his complaints to the actions of medical personnel, such as Dr. Tupa, in failing to provide him with certain medical restrictions that would impact his work assignment. Likewise, with respect to Grievance No. 2017108972, Plaintiff limited his grievance to asserting an ADA/RA claim against the TDCJ and seeking reasonable accommodations for his work restrictions. In  neither set of grievances did Plaintiff seek to resolve his deliberate indifference claims against Defendants Beard, Maciel, Salles, and Tijerina.

Plaintiff has come forward with no evidence in connection with his summary judgment motion to establish a genuine issue of material fact as to whether he

successfully exhausted his administrative remedies as to his deliberate indifference claim against Defendants Beard, Maciel, Salles, and Tijerina. Thus, even when viewing the competent summary judgment in a light most favorable to Plaintiff, Plaintiff failed to exhaust his deliberate indifference claims against them through both steps of the TDCJ grievance process. Furthermore, no evidence has been presented to excuse exhaustion. Accordingly, Defendants Beard, Maciel, Salles, and Tijerina are entitled to summary judgment in their individual capacities and dismissal of Plaintiff's deliberate indifference claim with prejudice for lack of exhaustion.[4]

### (2) Mootness

Plaintiff seeks injunctive relief against Warden Beard and Program Supervisor Maciel in their official capacities as well as the TDCJ in connection with his ADA/RA claim. These defendants contend that Plaintiff's claims seeking injunctive relief have been rendered moot because he has been transferred from the Stevenson Unit and is no longer subject to the allegedly onerous work assignments at that unit. (D.E. 99, p. 4).

At the time he filed this action, Plaintiff was housed at the Stevenson Unit. Plaintiff, however, was transferred from the Stevenson Unit on or around December 1, 2017. (D.E. 99-3, p. 6). To the extent that Plaintiff seeks injunctive relief on both his Eighth Amendment and ADA/RA claims regarding the conditions of his confinement at the Stevenson Unit, they have been rendered moot because he is no longer assigned to

---

[4] A dismissal for failure to exhaust is generally without prejudice. However, because any new grievance filed by Plaintiff would be time-barred under the TDCJ's grievance procedure and the failure to exhaust cannot be cured, dismissal with prejudice is appropriate in this case. *See Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) (holding that dismissal with prejudice warranted when administrative relief is time barred or otherwise precluded).

that facility.  *See Vasquez v. Morgan*, No. H-18-3978, 2019 WL 2393428, at \*2 (S.D. Tex. Jun. 6, 2019);  *Sias v. Jacobs*, No. 6:17cv413, 2017 WL 8229544, at \*4 (E.D. Tex. Dec. 11, 2017).   Accordingly, it is respectfully recommended that Plaintiff's Eighth Amendment and ADA/RA claims seeking injunctive relief against Defendants Bear, Maciel and the TDCJ are dismissed with prejudice as moot.

### (3)   *ADA/RA Claim*

Plaintiff claims that the failure of the TDCJ to provide him with a job assignment commensurate with his medical restrictions and within the scope of his disabilities amounts to a refusal to accommodate his disabilities in violation of the ADA/RA.   The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   Similarly, under the RA, "[n]o qualified individual with a disability . . .   shall, solely by reason of her or his such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.   29 U.S.C. § 794(a).

"The RA is operationally identical to the ADA in that both statutes prohibit discrimination against disabled persons; however, the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private."  *Borum v. Swisher County*, No. 2:14-CV-127-J, 2015 WL 327508, at \*3 (N.D. Tex. Jan. 26, 2015) (citing *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)).   Courts utilize the same standards in analyzing claims under both the ADA and RA.   *See Frame*

*v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011).  The undersigned, therefore, will analyze Plaintiff's ADA/RA claims as though they were raised as a single claim.  *See Borum*, 2015 WL 327508, at *3.

The Supreme Court has held that Title II of the ADA applies to state prison facilities and state prison services.  *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).  To establish a valid claim under Title II of the ADA, a plaintiff must show that (1) he is a qualified individual with a disability within the meaning of the ADA; (2) he was excluded from participation or denied meaningful access to services, programs, and activities, or that he was otherwise discriminated against by defendants; and (3) such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Texas*, 118 F.3d 421, 428 (5th Cir. 1997).  Intentional discrimination is required in order to recover compensatory damages under the ADA and RA.  *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).

Under the ADA and RA, discrimination effectively means failure to provide a reasonable accommodation to the needs of the disabled person.  *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004).  That is, by failing to accommodate for the disability of the disabled person, the defendant has effectivity discriminated against the person.  *Tennessee v. Lane,* 541 U.S. 509, 531 (2004) (Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion" or discrimination).

The Fifth Circuit has held that a prison's failure to satisfy the reasonable accommodation requirement may constitute a denial of services or benefits as well as

intentional discrimination sufficient to satisfy the second and third prongs of the Title II ADA inquiry. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners. *See United States v. Georgia,* 546 U.S. 151, 160 (2006) (recognizing prisoner's allegations that defendant refused to provide a reasonable accommodation to a paraplegic inmate, "in such fundamentals as mobility, hygiene, medical care," resulted in the disabled inmate suffering serious punishment "without penal justification" and supported claims under the ADA and RA).

The TDCJ contends in its dispositive motion that, based on the competent summary judgment evidence presented, Plaintiff has failed to establish any element of his ADA/RA claim. (D.E. 99, p. 8). Plaintiff responds primarily in support of his Eighth Amendment deliberate claims and offers no distinct argument in support of his ADA/RA claim. (*See* D.E. 112, pp. 22-24).

In this case, Plaintiff testified that: (1) he suffers from numbness to both of his hands, elbows, and shoulders when performing repetitive tasks; (2) he has health issues with his feet, such as ingrown toenails, which resulted from wearing steel toe boots; (3) he suffers from severe abdominal problems, in which he has pain, difficulty in crouching, and difficulty in using the bathroom; and (4) he was diagnosed by the Stevenson Unit's medical department as suffering from two types of hernias. Even assuming Plaintiff's various ailments amount to a showing that he is a qualified individual with a disability,

Plaintiff fails to demonstrate the second and third elements for establishing an ADA claim.

The competent summary judgment evidence shows that, at the time he was assigned to kitchen duty, he was subjected to work restrictions involving the repetitive use of his hands and the wearing of special footwear.  While a review of the essential job functions for work in the kitchen reveals that Plaintiff would need to use his hands, there is no explicit job requirement for kitchen work requiring the repetitive use of his hands. (D.E. 99-3, pp. 23, 30).  Nevertheless, when Plaintiff complained about medical issues incurred as a result of his work in the kitchen, he was reassigned to a different job as a janitor.  (D.E. 99-3, p. 5).  The essential job requirements of a janitor also indicate that Plaintiff would use his hands but contain no express requirement that the duties involve the repetitive use of hands.   (D.E. 99-3, p. 28).   Furthermore, when Plaintiff was diagnosed with a hernia in April 2017, an additional work restriction was placed on his HSM-18 prohibiting tasks that required lifting over 20 pounds.  (D.E. 99-1, p. 6).

Plaintiff has presented no summary judgment evidence to show that his assignments to the kitchen and janitor positions were directly contraindicated by any of his medical restrictions.  Based on a review of Plaintiff's medical restrictions and his work assignments, no genuine issues of material fact exist as to whether Plaintiff was denied a reasonable accommodation for his disability.  *See Quick v. Stephens*, No. 3:14-CV-83, 2017 WL 4174916, at *8 (S.D. Tex. Sep. 19, 2017) (dismissing prisoner's ADA claim because he alleged no facts to suggest that a particular accommodation was apparent or that he had requested any particular accommodation).   Thus, the

uncontroverted evidence fails to show that Plaintiff was denied a benefit or otherwise excluded from meaningful access to services or benefits. *See Garrett*, 560 F. App'x at 382.

Furthermore, even if further consideration could have been given to Plaintiff's work assignments in light of his medical issues, no competent summary judgment has been presented to demonstrate intentional discrimination against Plaintiff solely due to his disabilities. *See Borum v. Swisher County*, No. 2:14-CV-127, 2014 WL 4814541, at *9 (N.D. Tex. Sep. 29, 2014) (citing *Delano-Pyle*, 302 F.3d at 574) (recognizing that "[c]ourts have universally interpreted the third element of an ADA claim – discrimination by reason of plaintiff's disability – to require a showing of intentional discrimination on the part of the defendant").

As discussed above, no evidence has been presented to show that Plaintiff was denied a reasonable accommodation for his disabilities.  In the absence of any medical restrictions directly prohibiting Plaintiff's work assignments, the actions associated with Plaintiff's work assignments to the kitchen and then to janitor amount, at best, to negligence rather than intentional discrimination.  *See Evans v. Wright*, No. 6:14-CV-566, 2015 WL 5766862, at *8 (E.D. Tex. Sep. 29, 2015) ("Acts of negligence do not fall under the ambit of the ADA.").  Accordingly, even when taking as true the evidence in a light most favorable to Plaintiff, the uncontroverted summary judgment evidence demonstrates that Plaintiff has failed to establish an ADA/RA claim against the TDCJ. The undersigned respectfully recommends, therefore, that the TDCJ Defendants be

granted summary judgment in its favor as to Plaintiff's ADA/RA claim and that such claim be dismissed with prejudice.

## VI.    RECOMMENDATION

For the foregoing reasons, **IT IS RESPECTFULLY RECOMMENDED** that Dr. Tupa's Motion for Summary Judgment (D.E. 84) and the TDCJ Defendants' Motion for Summary Judgment (D.E. 99) be **GRANTED** in their entirety and that all of Plaintiff's § 1983 and ADA/RA claims raised against these defendants be **DISMISSED WITH PREJUDICE**.

Respectfully submitted this 29th day of July 2019.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).